```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

ELIZABETH MANON,

                Plaintiff,

           v.                             13 CV 3476(RJS)

GLOBE INSTITUTE OF TECHNOLOGY,
INC., et al.,

                Defendants.

------------------------------------x
                                          New York, N.Y.
                                          May 16, 2014
                                          2:30 p.m.
```

Before:

                HON. RICHARD J. SULLIVAN

                              District Judge

                    APPEARANCES

PHILLIPS & ASSOCIATES, ATTORNEY AT LAW, PLLC
    Attorneys for Plaintiff
BY: ALEX UMANSKY


LAMB & BARNOSKY, LLP
    Attorneys for Defendants Globe Institute, et al.
BY: MATTHEW JOHN MEHNERT


ALSO PRESENT
    Martin Oliner, President, 878 Education

            THE COURT:  So this is Manon versus Globe Institute of
Technology, 13 Civ. 3476.
            Let me take appearances for the plaintiff.
            MR. UMANSKY:  Good afternoon, your Honor.
            Alex Umansky, Phillips & Associates, for the
plaintiff.
            THE COURT:  Mr. Umansky, good afternoon to you.
            And for the defendants?
            MR. MEHNERT:  Matthew Mehnert of Lamb & Barnosky.
            THE COURT:  Mr. Mehnert, good afternoon.
            MR. MEHNERT:  Good afternoon.
            THE COURT:  We are here in connection with pretrial
motions -- well, pretrial letters in anticipation of a motion
for summary judgment.  So I have read the letters, read the
cases, considered the facts, at least as alleged and asserted,
looked at different causes of action.
            So let's talk about this a bit.  This is a claim for
discrimination.  Plaintiff is alleging that she was
discriminated against because of her responsibilities in taking
care of her disabled daughter, also seems to be alleging gender
discrimination, right, Mr. Umansky?
            MR. UMANSKY:  Yes.
            THE COURT:  So let's go with that one first.  Let's
talk about the Title 7 claim, the gender discrimination, sex
discrimination claim.

|   |   |
|---|---|
| 1 | You have read the letter of Mr. Mehnert. It is not |
| 2 | clear to me what facts or arguments could be made that your |
| 3 | client was fired because she was a woman or even a caregiver. |
| 4 | So what does the record reflect that her gender had anything to |
| 5 | do with her firing? |
| 6 | MR. UMANSKY: Your Honor, essentially, this is a claim |
| 7 | for disability association because of her daughter. |
| 8 | THE COURT: That one we are going to get to, but I |
| 9 | also thought that you were going to allege that there was just |
| 10 | straight gender discrimination? |
| 11 | MR. UMANSKY: But for her being a woman and a mother. |
| 12 | THE COURT: If she were a man and a father it wouldn't |
| 13 | be any different, would it? |
| 14 | MR. UMANSKY: I understand, your Honor. That's why we |
| 15 | didn't necessarily respond to it on the facts in the letter |
| 16 | because the crux of the claim here is the disability |
| 17 | association. |
| 18 | THE COURT: So it sounds like you are conceding that |
| 19 | the straight gender discrimination Title 7 claim will be |
| 20 | dismissed at summary judgment or maybe you are withdrawing it? |
| 21 | MR. UMANSKY: We can withdraw it. |
| 22 | THE COURT: Mr. Mehnert, am I missing something or is |
| 23 | that what you are seeking? |
| 24 | MR. MEHNERT: That is correct, your Honor. |
| 25 | THE COURT: Then we get to the association claim, in |

other words, the firing was because she is a caregiver of a disabled child. And that is problematic under the ADA, right?

Mr. Mehnert, I am going to let you carry the ball.

MR. MEHNERT: Sure.

THE COURT: You already got something, so you are not walking out of here empty-handed. If this were a game show, you would be getting at least a parting gift.

MR. MEHNERT: Your Honor, the associational disability claim, there is no evidence here that supports the claim and here is why.

Ms. Manon testified at her deposition that before she was terminated, she told Alfonso Garcia, one of the defendants and her supervisor, that her daughter had reactive airway disease and that that is the basis for the knowledge on the part of the defendants that they fired her because she had a daughter with a disability.

The problem is, the records don't back up that that diagnosis was made until after Ms. Manon was fired, meaning she couldn't have possibly made the representation that she claims under oath that she made. Leaving that aside for a moment, even if she could have made this claim to Mr. Garcia, the other evidence in the case that is relied on by the plaintiff are various emails and text messages, none of which establish that the defendants had knowledge of a disability sufficient to terminate Ms. Manon because of it.

1          The issue here is that Ms. Manon told her supervisors
2     that her daughter was sick.  Her daughter was in the hospital.
3     Her daughter was an infant.  There was no representation made
4     or could have been made that her daughter had a long-lasting
5     condition or a permanent condition that rises to the level of a
6     disability.  In the absence of any knowledge by the defendants,
7     then how can you have an associational disability -- I was
8     fired because of my association, but the defendants are unaware
9     of the association?
10          Leaving all of that aside --
11          THE COURT:  Let me stop you there.  There is sort of
12     the official authoritative diagnosis, but is it possible,
13     hypothetically, that a person can have a hunch or inkling of
14     what the problem is and disclose that to an employer and the
15     employer then fires that person because they say, if the kid
16     has got that, we don't want any part of it -- at least as a
17     theoretical matter, do you acknowledge that it would be
18     sufficient to bring a claim?
19          MR. MEHNERT:  As a theoretical matter, yes.  That is
20     not what happened here.  And Ms. Manon's representation is of a
21     very specific disorder.  I think my child might have asthma.  I
22     think my child might have something -- this is a very specific
23     disease with a very specific diagnosis which didn't exist until
24     after she was let go.
25          THE COURT:  Plaintiff is arguing -- obviously, I am

1    going to have Mr. Umansky respond -- that the defendants were
2    aware of the nature of the condition, maybe not the official
3    diagnosis, that the nature of the condition was communicated to
4    the defendants and the defendants then fired her like a day
5    after she came back from caring for the child in the hospital,
6    right?
7             MR. MEHNERT:  That is what is alleged, yes.  Ms. Manon
8    took several days off because her daughter was in the hospital.
9    Upon her return, she was terminated.  There is no dispute about
10   the sequence of facts.
11            With regard to what Ms. Manon represented to her
12   employer, I don't believe and I believe that the facts will
13   bear out, that is not sufficient to show the kind of knowledge
14   that is required to support this claim.  And even if she could
15   show it, Ms. Manon cannot escape the fact that she had numerous
16   performance problems and that that is really the reason that
17   she was let go and not because she had a child who was sick.
18            THE COURT:  The performance problems, that certainly
19   supports your non-discriminatory basis for firing her, so I
20   think that you get past the second prong on the burden-shifting
21   test, but then the issue comes back to plaintiff to establish
22   that the asserted reason was pretext, and the real reason was
23   discrimination as the caregiver of a disabled child.
24            So I guess that I will hear Mr. Umansky on that, but
25   the mere fact that you can articulate, your client can

1  articulate a non-discriminatory basis for firing her doesn't
2  end the inquiry, right?
3            MR. MEHNERT:  That's correct, your Honor.
4            THE COURT:  Let me hear from Mr. Umansky and maybe you
5  respond to that.
6            Mr. Umansky, what are the facts that have been
7  developed in discovery that support an inference that the
8  firing was because of the child's condition?
9            MR. UMANSKY:  The day after plaintiff returned from
10 the hospital, she was terminated --
11           THE COURT:  I get that.  But here's the deal.  If I
12 miss work because I have to take my child to the hospital
13 because he has a broken ankle, that might be a lousy, rotten
14 thing to do and an employer should be ashamed for firing me for
15 that, but that wouldn't be sufficient to bring a cause of
16 action for associational disability because a broken ankle is
17 not a disability that would fall under the statute, right?
18           MR. UMANSKY:  Temporal proximity.
19           THE COURT:  Temporal proximity is a different issue,
20 but right now we have to show that there is association between
21 your client and the person with the disability was the reason
22 for the firing.  And I think you have to show that the
23 disability was a disability and not just a kid needing
24 stitches, right?
25           MR. UMANSKY:  Yes.

1        THE COURT:  So what is the record evidence developed
2    through discovery that the defendants were aware of this
3    condition and were on notice that it was a disability, would
4    meet the standard for a disability?
5        MR. UMANSKY:  Under the ADA, it has to be a disability
6    that affects the -- basically, she has to be very sick.
7        Amelia, the daughter, is an infant.  The evidence, the
8    record, the emails, the text messages show that numerous
9    statements by Ms. Manon to Al Garcia and Mr. Oliner state that
10   she has low oxygen levels, she has difficulty breathing, she
11   has issues with her lungs -- maybe she didn't exactly say
12   reactive airway disease, but this is a progressive diagnosis.
13       They knew that Ms. Manon's daughter was extremely ill.
14    She was in the hospital for two days in October.  She was in
15   the hospital for two days in November.  This wasn't a common
16   cold.  This wasn't a broken leg.
17       And reactive airway disease, as we mentioned in the
18   complaint, when the child gets old enough, they have these
19   diagnostic tests by the doctors -- bronchial challenge test --
20   to determine how to treat this condition.  But when they are
21   infants, the oxygen levels are low.  It is very difficult for
22   them to breathe.  They have to be admitted to the hospital.
23       THE COURT:  The real issue is, what evidence is there
24   that the defendants knew about the disability?
25       MR. UMANSKY:  The emails, the text messages and

1    personal conversations between Ms. Manon and Mr. Garcia.  They
2    knew that her daughter was extremely ill.  What defendants are
3    arguing is that they didn't know the exact nature of the
4    disability, they didn't know that it was reactive airway
5    disease, and I don't think it matters.  It doesn't matter what
6    you call it.  The disability here does not equal a disease.  It
7    is the symptoms and what her daughter was experiencing, being
8    in the hospital.  They were aware of that.  They knew that her
9    daughter was disabled.
10             Under the New York City Human Rights Law, it is any
11   medical impairment.  Under the ADA, it has to substantially
12   affect a life function.  If you are laying in the hospital as
13   an infant and you can't breathe -- the defendants definitely
14   knew about it because there were multiple text messages and
15   emails and personal conversations where they knew that the
16   daughter was extremely ill.
17             As far as the performance issues, there is not a
18   single document they can provide to show that Ms. Manon had
19   performance issues.  It is strictly Mr. Garcia's allegations.
20   And under the mixed motives standard all we have to show is one
21   of the motivating factors to terminate her employment was her
22   daughter's disability and the association there, and I think
23   that's a question for the jury.
24             THE COURT:  Mixed motives, I am not sure about that.
25   I want to get to that in a minute, but right now I want to stay

1  focused on what is the record evidence with respect to
2  knowledge in the possession of the defendants about a
3  disability on the part of the child.
4  So, Mr. Mehnert, there seems to be a disputed issue of
5  fact that we may need to develop in the papers, but
6  conceding -- as I think Mr. Umansky has conceded -- that the
7  official diagnosis wasn't made until after the termination, I
8  am not sure that is dispositive if there is disclosure of the
9  nature of the condition, that it was serious, that it was
10 ongoing, that it would meet the criteria for a disability, the
11 fact that the formal diagnosis didn't come until later is not
12 dispositive, right?
13 MR. MEHNERT:  I would agree to an extent.
14 And before I go any further, Martin Oliner, who is the
15 president of 878 Education has joined me at the table.  I
16 apologize, he is a few minutes late.
17 THE COURT:  That is Mr. --
18 MR. MEHNERT:  -- Martin Oliner.
19 THE COURT:  He can sit there.  He is a principal of
20 the corporate defendant?
21 MR. MEHNERT:  Yes.
22 THE COURT:  Good afternoon.
23 MR. OLINER:  Good afternoon.
24 MR. MEHNERT:  With regard to the knowledge issue, your
25 Honor, the significance of what the actual diagnosis was really

relates to the weight of some of Ms. Manon's testimony. Even though credibility is technically not an issue, the problem here is impossible -- Ms. Manon testified in a manner that is impossible compared to the actual facts that have been presented by her during the course of discovery.

But leaving that off to the side and coming back to the issue about knowledge, the emails and the text messages that Ms. Manon is going to rely upon represent to her employer that she needs to be out from work, that her daughter is in the hospital. One of them says she has pneumonia. One of them says she has bronchitis.

THE COURT: Neither of which would give rise to the level of a disability.

MR. MEHNERT: 150 percent correct, your Honor.

The only other evidence in the record is Ms. Manon's testimony that, I told Alfonso Garcia my child had reactive airway disease which, as plaintiff will now have to concede, it is not possible because it didn't happen until after she was fired, meaning that the only three pieces of evidence that she has, one is impossible and the other two are not sufficient --

THE COURT: Stop.

Mr. Umansky, is that accurate?

MR. UMANSKY: What is accurate, your Honor, is that she was officially diagnosed with reactive airway disease in December 2012.

        THE COURT: After the termination?

        MR. UMANSKY: After the termination.

        THE COURT: If prior to the termination the record is undisputed that the parent said, oh, my daughter has pneumonia or, oh, my daughter has bronchitis, those wouldn't rise to the level of disability, right?

        MR. UMANSKY: Under the New York Human Rights law, we believe it would.

        THE COURT: I am focused on the ADA.

        MR. UMANSKY: On the ADA, no, but my client is not a doctor.

        THE COURT: She doesn't have to be a doctor, but the issue is whether or not a jury could conclude that the termination by the defendants was motivated by the little girl having a disability as opposed to a cold or a broken bone.

        MR. UMANSKY: Absolutely, because bronchitis, pneumonia weren't the only things Ms. Manon says:

        Amelia, again, she is having trouble breathing -- this is November 14.

        Her oxygen level is only at 60, they are trying to get her up to 94 at least.

        She is extremely ill.

        I have to keep her on asthma treatment every four hours -- this is November 15.

        Asthma is a disability under the ADA.

13
E5GUMANC

|   |   |
|---|---|
| 1 | THE COURT: Asthma, but pneumonia is not, you concede? |
| 2 | MR. UMANSKY: Right. |
| 3 | She sent a picture of her daughter laying in the hospital bed. |

THE COURT: Asthma, but pneumonia is not, you concede?

MR. UMANSKY: Right.

She sent a picture of her daughter laying in the hospital bed.

They knew that Amelia, the daughter, was extremely ill. Whether we call it one thing or another, I don't think that is important. What they knew was that the daughter was ill, and the jury can decide whether that was the sole decision or the motivating factor to terminate her employment.

THE COURT: We will get to the standard in a second.

You are really hanging your hat, it seems to me, on the email that says she is getting asthma treatment on November 15.

What is the date of the termination?

MR. UMANSKY: November 16.

THE COURT: Mr. Mehnert, is that accurate? There is an email about asthma treatment on the 15th and termination is on the 16th.

MR. MEHNERT: She is terminated on the 16th, your Honor. There is an email about her being in the hospital and what treatment she was receiving on the 15th because Ms. Manon had to report she was being asked -- I don't agree that the emails or the texts present a sufficient case for the child having disability and that that disability was known. I don't believe that that connection has been made, and I don't believe

1  that the documents which we will present to you on motion bear
2  that out.
3             THE COURT:  I think that I have to see the motion.  I
4  should have said at the outset, the purpose of a premotion
5  conference, from my perspective -- and we are only doing it
6  because I ordered it -- it helps line up the issues.  It helps
7  me get a better handle on what the motion is about and whether
8  it is a likely winner or loser.  And I think that is
9  valuable -- certainly from my perspective it is valuable.
10            That being said, I don't ever tell a party they can't
11 make a motion nor do I rule before the motion has been made,
12 but I do think that it can be productive to have a few innings
13 on the merits and make sure we can talk about the facts.  And I
14 think at the very least, it helps you focus your briefs and
15 focus your 56.1 statements.  So that is my role today, to
16 really focus and narrow the issues.  And it seems like we have
17 narrowed -- it sounds like the Title 7 gender discrimination
18 claim is out.  We are really just focusing on the associational
19 disability claim.
20            So I guess I have to really see what the record is as
21 to whether there is a sufficient basis on which to say that the
22 defendants possessed knowledge of a disability and then get to
23 the next step, which is, and that was the reason for the
24 termination.
25            I think that we should spend a minute on the mixed

1  motive analysis and what the standard ought to be here.  There
2  is some old case law that says that it had to be a motivating
3  factor under Title 7.  That was the standard.  But then the
4  Supreme Court's decision in Gross, I think that has now really
5  called it into question.  It has to be a but-for causation
6  standard, I think, under the statute, it seems to me -- but
7  maybe I am wrong, so let's talk about that.
8       Certainly there are judges in the district court -- I
9  don't think that the circuit has reached this yet -- that have
10 said, the mixed motive analysis under the ADA has been called
11 into doubt by Gross.  That is Judge Koeltl.  I think Judge
12 Karas has said something similar.  You folks disagree on this.
13      Mr. Umansky, you seem to think that mixed motive
14 analysis as a motivating factor is enough?
15      MR. UMANSKY:  Yes.
16      THE COURT:  How do you get around the language of
17 Gross which talks about but-for?
18      MR. UMANSKY:  The Mahalick case in the circuit, 2013,
19 allows for use of it as a motivating factor and doesn't
20 necessarily follow Gross.  We would rely on that.  Also, the
21 First Department cases -- well, the New York Human Rights cases
22 don't require a but-for standard.
23      THE COURT:  We have Title 7.  We have the ADEA, the
24 Age Discrimination in Employment Act and then we have the ADA,
25 Americans with Disabilities Act.  Your motion is on the

1  Americans with Disabilities -- I mean your cause of action,
2  excuse me?
3          MR. UMANSKY:  Right.
4          THE COURT:  Gross is not dealing with the ADA, but I
5  guess the issue is whether the ADA is similar to the ADEA.  I
6  think that really is the issue.  I think it is an interesting
7  one.  It has not been resolved by the circuit as far as I am
8  aware.
9          MR. UMANSKY:  Your Honor, even under the but-for
10 standard, even under Gross we believe -- and it is a question
11 for a jury -- that we would be able to show that she was
12 terminated because of her daughter's disability and for nothing
13 else.
14         Other than Mr. Garcia's allegations -- and he had a
15 very long deposition where we believe he made a lot of
16 misstatements -- there is not one piece of evidence, not one
17 document to show that Ms. Manon was a poor worker, that she was
18 a poor performer, everything was according to Mr. Garcia.  Ms.
19 Manon denies that.  That is a question of fact for the jury.
20         THE COURT:  Mr. Mehnert.
21         MR. MEHNERT:  I think I agree with what's been said in
22 terms of the standard here.  I believe but-for causation is
23 what is required.
24         THE COURT:  Under Gross?
25         MR. MEHNERT:  Yes.  But I would concede that it has

1  not fully been resolved by the Second Circuit as to the ADA; it
2  has been resolved only as to the ADEA.
3            I would agree with Mr. Umansky as to the New York City
4  statute.  There are a significant number of cases saying that
5  Gross does not apply to those cases.  So I agree there.
6            THE COURT:  Can I stop you, though?
7            If I rule in your favor on the federal claims, am I
8  getting to the state law claims at all; there is no diversity?
9            MR. MEHNERT:  No, your Honor.  There would be no
10 reason to exercise supplemental jurisdiction because there
11 would be no surviving federal claim.
12           With regard to the issue of whether or not the
13 plaintiff could overcome the but-for standard, plaintiff's own
14 testimony here was that she was counseled more than once about
15 her issues, that Mr. Garcia testified that multiple people came
16 to him and complained about Ms. Manon.  He testified and it was
17 admitted by Ms. Manon that he met with her on several occasions
18 to address her performance issues.  Ms. Manon again testified
19 in a manner that was utterly inconsistent with the records.
20           Mr. Umansky said that there were no documents.  Yes,
21 there is.  Ms. Manon's attendance records which were produced
22 in discovery in this case show that she was late on a number of
23 occasions, that she was absent independent of her daughter's
24 illness that put her in the hospital.  She was absent on a
25 number of occasions during her six-month employment with the

        defendants. Under oath, Ms. Manon said that the first time she was ever late in her entire employment with the defendants was four months in, yet the attendance records show that she is just lying about it. She had been absent or late numerous times before she was originally verbally counseled by Mr. Garcia.

        So the idea that there is no formal written evaluation or no formal write-up -- this is a six-month employee who is working as a receptionist. There are no formal performance evaluations -- she was not there long enough for one. But the evidence that is undisputed that include plaintiff's admission about the counseling demonstrates that she cannot show but-for causation -- she will never be able to meet that and, therefore, it shouldn't get to the jury.

        THE COURT: I think we are obviously going to have to have the motions. I am going to take a look at what the record looks like. I think that the one legal issue is the one about the standard, mixed motive, but-for cause. So I think that will be an interesting issue and one that I will be resolving on my own, although there are other district courts that have at least taken a pass at this. And I guess that we will see where we are.

        So let's talk about scheduling.

        When did you want to make this motion?

        MR. MEHNERT: Your Honor, I would ask that I be

19
E5GUMANC

permitted to submit the motion on June 27th which is six weeks from today, the reason being, normally I would only ask for 30 days, but I am on trial in two weeks and, with fairness to one of my other clients, I don't want to disadvantage this client because I have something with another.

THE COURT: June 27th.

How long to respond, Mr. Umansky?

MR. UMANSKY: Your Honor, I would ask for three weeks.

THE COURT: That puts us at July 15 or so -- July 18th, a Friday.

And then a reply brief Mr. Mehnert, if any?

MR. MEHNERT: Two weeks, whatever the date is.

THE COURT: That is August 1 for a reply.

Why don't I see what I've got -- I am not sure I will need oral argument. I am not sure. Let me take a look at the briefs and see if I need oral argument. Cases like this, I don't find it is necessary for oral argument because the record is in front of me and I just have to apply the burden-shifting test and I am not sure that oral argument is essential, and we have had a bit of it here now. But if I think that it will help, I will schedule it. So by August 1st, it will be fully submitted and I will get back to you in about 30 days as I think about what you said.

Now, in the meantime, remind me, have you taken a crack at settlement at this point?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    MR. MEHNERT:  Yes, your Honor.  We were referred to
2 the court's mediation program and it was unsuccessful.
3    THE COURT:  Any reason to take a crack at a magistrate
4 judge or do you think that you just want to make the motion?
5    MR. MEHNERT:  Not that I am aware of -- there has not
6 been any movement since the mediation before the new year.
7    THE COURT:  If as you are getting ready to brief this
8 thing and you think, well, let's have another go-round before
9 we start immersing ourselves in briefs and 56.1 statements, let
10 me know, but otherwise let me go with this schedule.
11    I will issue an order that memorializes these dates
12 and then we will see where we are.
13    Anything else for us to talk about today?
14    MR. UMANSKY:  That's it.  Thank you, your Honor.
15    THE COURT:  Thank you, Mr. Umansky.
16    Mr. Mehnert, Mr. Oliner, happy to see you.
17    Stay dry.
18    Have a nice weekend.
19    And I will be hearing from you guys shortly.
20    Thanks a lot.
21                          o   0   o